# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

TIBCO SOFTWARE, INC., )
)
           Plaintiff, )    C.A. No. N18C-08-072 MAA
)
      v. )
)
NTHRIVE REVENUE SYSTEMS, )
LLC, )
)
           Defendant. )

Submitted: September 10, 2019
Decided: November 21, 2019

*Upon Defendant nThrive Revenue Systems, LLC's Motion for Summary Judgment:*
*Denied*

## MEMORANDUM OPINION

Josiah R. Wolcott, Esquire, of CONNOLLY GALLAGHER, LLP, Newark, Delaware, Attorney for Plaintiff.

Chad S.C. Stover, Esquire, of BARNES & THORNBURG, LLP, Wilmington, Delaware, Attorney for Defendant.

**Adams, J.**

This case involves the interpretation of a contract between plaintiff TIBCO Software, Inc. ("TIBCO") and MedAssets Net Revenue Systems, LLC ("MedAssets") for information technology products, services and support. Defendant nThrive Revenue Systems, LLC ("nThrive") is the successor in interest to MedAssets. At the heart of this case is whether nThrive had the authority to terminate certain maintenance services pursuant to the termination provisions of the agreement at issue. According to nThrive, this question can be answered in the affirmative because of the September 27, 2016 Termination Letter, which nThrive claims validly terminated all future obligations to purchase maintenance services. The answer to this question, however, is not so simple. For the reasons stated herein, the Court finds that genuine issues of material fact exist on whether nThrive had the authority to terminate and the meaning of the termination provisions, thereby precluding summary judgment. nThrive's motion for summary judgment is, therefore, denied.

## FACTS AND PROCEDURAL BACKGROUND

The following facts are drawn from the pleadings and the record currently before the Court, viewed in the light most favorable to the non-moving party.[1]

On May 25, 2010, TIBCO and MedAssets entered into a contract under which MedAssets purchased information technology products, services and support under the MedAssets Order Form and Services Agreement ("MedAssets Order Form" or "Agreement").[2] The Agreement continued from 2010 through 2016, although the MedAssets Order Form "was amended from time to time" and the two companies executed additional Work Orders.[3] Those additional Work Orders were incorporated into the MedAssets Order Form and developed into the MedAssets Legacy Agreements.[4]

TIBCO sent an invoice to MedAssets dated December 11, 2015 for Silver Level Maintenance under the MedAssets Order Form in the amount of

---

[1] *See GMG Capital Investments v. Athenian Venture Partners*, 36 A.3d 776, 779 (Del. 2012) (citing *State Farm Mut. Auto. Ins. Co. v. Patterson*, 7 A.3d 454, 456 (Del. 2010)).

[2] Compl. ¶¶ 4–5; Def. nThrive Revenue Systems, LLC's Opening Br. in Supp. of Mot. for Summ. J. 2.

[3] Compl. ¶ 6; Compl. Ex. B.

[4] Ans. Br. of Pl. TIBCO Software Inc. in Resp. to Def. nThrive Revenue Systems, LLC's Mot. for Summ. J.3–4; Compl. Ex. B.

$318,377.95 for the annual period of January 1, 2016 to December 31, 2016.[5] This invoice was paid.[6]

In 2016, MedAssets underwent a merger that resulted in the formation of nThrive.[7] On January 27, 2016, Pamplona Capital Management LLP ("Pamplona") purchased MedAssets, Inc. and all of its subsidiaries and affiliates.[8] This included The Broadlane Group and MedAssets Net Revenue Systems, LLC.[9] Pamplona then sold the spend and clinical resource management segment, which included The Broadlane Group, to Vizient, Inc.[10] Pamplona retained ownership of MedAssets Net Revenue Systems, LLC.[11]

Leading up to and shortly after Pamplona's purchase of MedAssets, there were communications between MedAssets employees regarding the effect of these transactions on the companies' continued access to the TIBCO licenses that were provided under the MedAssets Order Form.[12] Specifically, these communications discussed the need to adjust the MedAssets Order Form to reflect Pamplona and

---

[5] Answer Ex. 2.
[6] Answer ¶ 6; Def. nThrive Revenue Systems, LLC's Suppl. Br. in Supp. of Mot. for Summ. J. Ex. 6 at 52.
[7] Def.'s Opening Br. in Supp. of Mot. for Summ. J. 1.
[8] Def.'s Suppl. Br. Ex. 6 at 33, Ex. 15.
[9] Compl. Ex. B.
[10] Compl. Ex. B.
[11] Compl. Ex. B.
[12] Def.'s Suppl. Br. Ex. 15.

Vizient as "customers."[13] Although a letter to TIBCO was drafted requesting this change,[14] it is unclear whether the letter was ever sent. In any event, TIBCO claims it denied the request.[15]

Prior to Pamplona's purchase of MedAssets, Inc. and its subsidiaries, RCM Holdco, Inc. was the sole member of MedAssets.[16] On July 7, 2016, a certificate of amendment[17] and certificate of merger[18] were filed with the Delaware Secretary of State, indicating the merger of RCM Holdco, Inc. into nThrive, Inc. nThrive became the sole member of MedAssets as a result of the merger.[19] nThrive asserts that this "rebranding" was merely a "name change" and that MedAssets did not change its corporate structure after the purchase by Pamplona.[20] TIBCO, however, asserts that a corporate restructuring occurred and resulted in a new entity.[21]

On September 23, 2016, after a conversation between individuals from nThrive and TIBCO, TIBCO sent a letter to nThrive warning that nThrive was

---

[13] Def.'s Suppl. Br. Ex. 15 at TIB0000069.
[14] Def.'s Suppl. Br. Ex. 15 at TIB0000071-72.
[15] Suppl. Br. of Pl. TIBCO Software Inc. in Opp'n to Def. nThrive Revenue Systems, LLC's Mot. for Summ. J. 4.
[16] Compl. Ex. B.
[17] Aff. of Jennie Do Supp. Def.'s Suppl. Br. in Supp. of Mot. for Summ. J. at Ex. 9.
[18] Transmittal Aff. of Josiah R. Wolcott in Supp. of Suppl. Br. of Pl. TIBCO Software, Inc. in Resp. to Def. nThrive Revenue Systems, LLC's Mot. for Summ. J. Ex. D.
[19] Compl. Ex. B.
[20] Answer ¶ 2; Def.'s Suppl. Br. Ex. 12 at 34.
[21] Pl.'s Ans. Br. to Def.'s Mot. for Summ. J. 4.

"currently using TIBCO Software that has not been contractually assigned following a sequence of extraordinary corporate events involving MedAssets Net Revenue Systems that resulted in the renamed entity of nThrive."[22]

On September 27, 2016, nThrive sent a letter ("Termination Letter") to TIBCO stating that nThrive would not renew its order of Silver Level Maintenance from TIBCO at the end of the 2016 period.[23]

nThrive's Termination Letter implicates three provisions of the Agreement. First, the Extraordinary Corporate Event clause provides:

> To the extent Licensee or its successors or assigns enters into an Extraordinary Corporate Event after the Order Form Effective Date, this Agreement, as amended, shall not apply to those additional users, divisions or entities, which were added to Licensee's organization as a result of the Extraordinary Corporate Event until those additional users, divisions or entities are added to this Agreement by way of a written amendment signed by duly authorized officers of Licensor and Licensee.[24]

"Extraordinary Corporate Event" is defined in the Product Restrictions and Definitions as:

> a corporate transaction which results in Licensee acquiring, being acquired by, merged, or otherwise combined with another entity or into another entity's legal or corporate structure (including an acquisition of all or substantially all of the assets of another entity)

---

[22] Wolcott Transmittal Aff. in Supp. of Pl.'s Suppl. Br. Ex. G.
[23] Answer ¶ 6.
[24] Compl. Ex. A § 7.1.

-6-

which, prior to the corporate transaction, was not part of the Licensee or its legal or corporate structure.[25]

Second, the assignments provision states:

> Except for an assignment, in whole or part, by Licensor to a wholly owned subsidiary, neither party may assign this Agreement and/or any of its rights and/or obligations without the prior written consent of the other party (which shall not to be unreasonably withheld). Any such attempted assignment shall be void. For the purposes of the foregoing, a change in control of Licensee is deemed to cause or attempt to cause an assignment of this Agreement and shall require Licensor's prior written consent.[26]

Finally, the termination provision states, in relevant part, that "[e]ither party may terminate […] Maintenance, upon prior written notice at least sixty (60) days prior to the end of any annual Maintenance period."[27]

nThrive asserts that it had the right to terminate Silver Level Maintenance by providing written notice at least sixty (60) days prior to the end of the Maintenance period, pursuant to § 19.1(c) of the Agreement.[28] nThrive argues that, because it sent the Termination Letter in accordance with § 19.1(c), it was not responsible for continued payments for Silver Level Maintenance beyond December 31, 2016.[29] TIBCO counters that nThrive did not have the authority to terminate this service

---

[25] Compl. Ex. A, Product Restrictions and Definitions.
[26] Compl. Ex. A § 21.5. "Change in control" is not defined within the MedAssets Order Form and Services Agreement nor in the Product Restrictions and Definitions.
[27] Compl. Ex. A § 19.1.
[28] Answer ¶ 6.
[29] Answer ¶ 6.

-7-

and that the Termination Letter was ineffective.[30] TIBCO bases this argument on the triggering of the Extraordinary Corporate Event clause and the assignments provision of the Services Agreement, as well as its assertion that nThrive is a separate entity from MedAssets and was, therefore, not a party to the MedAssets Order Form.[31]

On November 9—10, 2016, TIBCO employees exchanged emails regarding MedAssets' status under the MedAssets Order Form.[32] These emails suggest some awareness by TIBCO of nThrive's attempt to terminate Silver Level Maintenance, although they also express an expectation that nThrive would ultimately renew Silver Level Maintenance.[33]

On November 10, 2016, TIBCO and nThrive executed the nThrive Order Form under which nThrive agreed to "assume all of MedAssets' rights, duties, and obligations existing under the MedAssets Legacy Agreements," effective November 4, 2016.[34] The nThrive Order Form also states that "Customer [nThrive] acknowledges that the Maintenance Fees for the Software under this Order Form are *in addition to* the existing Maintenance Fees that are due and

---

[30] Pl.'s Ans. Br. to Def.'s Mot. for Summ. J. 8–9.
[31] Pl.'s Ans. Br. to Def.'s Mot. for Summ. J. 8–9.
[32] Def.'s Suppl. Br. Ex. 14.
[33] Def.'s Suppl. Br. Ex. 14.
[34] Compl. ¶ 7; Answer ¶ 8; Def.'s Opening Br. in Supp. of Mot. for Summ. J. 5.

payable for Software licensed under previous agreement(s)."[35] TIBCO asserts that, under this agreement, nThrive agreed to assume all of MedAssets' obligations to secure and pay for the same Silver Level Maintenance for the software license that MedAssets had chosen under the MedAssets Order Form.[36]

TIBCO sent an invoice to nThrive on November 14, 2016 for $334,296.84 for Silver Level Maintenance for the annual period of January 1, 2017 through December 31, 2017.[37] TIBCO sent an invoice for Silver Level Maintenance again the following year, on December 12, 2017, for the annual period of January 1, 2018 through December 31, 2018 in the amount of $351,011.69.[38] nThrive did not pay either invoice.[39]

**Procedural Posture**

nThrive filed its original Motion for Summary Judgment on October 10, 2018, prior to any discovery by the parties. TIBCO filed its Answering Brief on November 9, 2018. On January 7, 2019, the Court ordered "a period of limited and focused fact discovery, followed by limited supplemental briefing."[40] On April 15, 2019, the Court granted in part TIBCO's Motion to Compel, to the extent that it

---

[35] Compl. Ex. B at 5 (emphasis added).
[36] Pl.'s Ans. Br. to Def.'s Mot. for Summ. J. 7.
[37] Compl. ¶ 11.
[38] Compl. ¶ 11.
[39] Compl. ¶ 14.
[40] So Ordered Am. Stip. and Prop. Sched. Order, Apr. 5, 2019.

sought production of "final, executed transactional documents with respect to: (i) Pamplona's purchase of MedAssets, Inc.; and (ii) the merger between RCM Holdco, Inc. and nThrive, Inc."[41]

nThrive filed its Supplemental Brief in Support of its Motion for Summary Judgment on May 15, 2019, following limited discovery. nThrive included the following additional arguments in its Supplemental Brief: (i) that TIBCO's interpretation of the contract would lead to the "absurd" result of nThrive being simultaneously responsible for the obligations under the MedAssets Order Form while lacking the authority to terminate the agreement; and (ii) that, should only MedAssets be found to have had authority to terminate the contract, nThrive's termination was still valid because it was acting as an agent of MedAssets.[42] TIBCO filed its Supplemental Brief in response on May 29, 2019 and nThrive filed its Supplemental Reply on June 12, 2019. The Court heard oral argument on September 10, 2019.

---

[41] Mot. to Compel Order.

[42] Def.'s Suppl. Br. 8–9.

-10-

## ANALYSIS

There is no absolute right to summary judgment.[43] Summary judgment is a "harsh remedy" that "must be cautiously invoked."[44] Under Superior Court Civil Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[45] "In evaluating the summary judgment record, a trial court shall not weigh the evidence or resolve conflicts presented by pretrial discovery."[46]

The Court must view the facts in the light most favorable to the non-moving party.[47] The Court should not grant summary judgment "if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[48] The Court "maintains the discretion to deny summary

---

[43] *AeroGlobal Capital Mgmt., LLC. v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005) (citing *Cross v. Hair*, 258 A.2d 277, 278 (Del.1969)).

[44] *GMG*, 36 A.3d at 783 (citing *Williams v. Geier*, 671 A.2d 1368, 1389 (Del. 1996)).

[45] Del. Super. Ct. Civ. R. P. 56(c).

[46] *AeroGlobal*, 871 A.2d at 444 (citing *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002)).

[47] *GMG*, 36 A.3d at 779 (citing *State Farm Mut. Auto. Ins. Co. v. Patterson*, 7 A.3d 454, 456 (Del. 2010)).

[48] *Geier*, 671 A.2d at 1388–89 (Hartnett, J. and Horsery, J. dissenting) (citing *Ebersole v. Lowengrub*, 180 A.2d 467 (Del. 1962)).

judgment if it decides that a more thorough development of the record would clarify the law or its application."[49]

A genuine issue as to a material fact exists when, in the context of a contract dispute, reasonable minds could differ as to the contract's meaning.[50] Where a contract is ambiguous or silent on an issue, the factfinder will examine the extrinsic evidence presented by the parties to construe the contract or determine the parties' intent.[51] If a contract is ambiguous, "the resolution of the ambiguity becomes a trial issue for the jury" and summary judgment is inappropriate.[52]

## I.  A factual dispute exists regarding nThrive's authority to terminate the MedAssets Order Form.

Central to this motion for summary judgment is the issue of whether nThrive had the authority to terminate the MedAssets Order Form and Services

[49] *B.A.S.S. Group, LLC v. Coastal Supply Co., Inc.*, 2009 WL 1743730, at *4 (Del. Ch. June 19, 2009) (quoting *Tunnell v. Stokley,* 2006 WL 452780, at *2 (Del. Ch. Feb.15, 2006).

[50] *GMG,* 36 A.3d at 783.

[51] *Norton v. K–Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013); *Simon-Mills, II, LLC. v. Kan Am USA XVI Ltd. P'ship,* 2017 WL 1191061, at *17 (citation omitted) (Del. Ch. Mar. 30, 2017).

[52] *Khan v. Delaware State Univ.,* 2017 WL 815257 (Del. Super. Feb. 28, 2017) (citing *GMG,* 36 A.3d at 783); Lawrence M. Solan, *Pernicious Ambiguity in Contracts & Statutes,* 79 Chi–Kent L.Rev. 859, 861-62 (2004); *United Rentals, Inc. v. RAM Hldgs., Inc.,* 937 A.2d 810, 841–42 (Del. Ch. 2007)).

Agreement.[53]  TIBCO asserts that, because nThrive is a separate entity from MedAssets, nThrive was not a party to the MedAssets Order Form and, therefore, had no authority to terminate the contract.[54]  nThrive asserts that it had this authority because nThrive and MedAssets are the same entity and that only the name of the entity had changed.[55]

A genuine issue of material fact exists on this issue, precluding the granting of summary judgment.  nThrive asserts that the merger did not change the corporate structure of MedAssets and that the only change to this entity was in its name, "regardless who (sic) MedAssets' corporate parent happened to be at any given time."[56]

TIBCO has presented a contrary view of the facts.  According to TIBCO, Pamplona's purchase of MedAssets, Inc. and its subsidiaries, followed by a sale of a portion of those subsidiaries to Vizient, then followed by a rebranding of a remaining portion of those subsidiaries, is a more complex process than a name

---

[53] Because of the other factual issues surrounding the Termination Letter, the Court need not reach the issue of whether TIBCO received proper notice of the termination under the Services Agreement or common law.
[54] Def.'s Opening Br. in Supp. of Mot. for Summ. J. 10.
[55] Pl.'s Ans. Br. to Def.'s Mot. for Summ. J. 8-9.
[56] Def.'s Suppl. Br. at 6, n.4.

change. The description of the transaction in the nThrive Order Form dated November 4, 2016 appears to support this contention.[57]

TIBCO asserts that the only way nThrive would have the authority to terminate the contract "is if they become a party to the MedAssets Order Form."[58] As discussed below, TIBCO's position is that this could only occur if TIBCO consented under § 21.5 or § 7.1, and nothing in the record shows that TIBCO agreed.[59] According to TIBCO, MedAssets was the only party that could terminate the MedAssets Order Form.[60]

Viewing the facts alleged in a light most favorable to TIBCO, there is a genuine dispute as to the nature of these corporate transactions as they relate to the status of nThrive as either the same entity as or a new entity from MedAssets. nThrive has failed to show a lack of dispute over the nature of these transactions and its assertions that it is the same legal entity as MedAssets are not sufficient to show entitlement to judgment in its favor.

## II. The MedAssets Order Form is ambiguous, thereby preventing summary judgment.

Genuine disputes remain as to whether the triggering of either the Extraordinary Corporate Event clause or the assignment clause would preclude

---

[57] Compl. Ex. B.
[58] Oral Arg. Tr. at 37:1–3.
[59] Oral Arg. Tr. at 37:3–6.
[60] Oral Arg. Tr. at 33:16–18.

nThrive from terminating the contract, as well as to the status of nThrive as a separate entity or the same entity as MedAssets.

If the Extraordinary Corporate Event clause (§ 7.1) applies to the present case, it would require "a written amendment" in order for the Agreement to apply to the "additional users" in question.[61] The assignment provision (§ 21.5) prohibits the assignment of any rights or obligations under the Agreement "without the prior written consent of the other party," and "[a]ny such attempted assignment shall be void."[62]

TIBCO argues that the Extraordinary Corporate Event clause and the assignments provision of the MedAssets Order Form and Services Agreement were triggered by the MedAssets merger.[63] TIBCO also argues that, if the purchase by Pamplona did not trigger the assignment or Extraordinary Corporate Event provisions, then the "name change" did.[64]

nThrive asserts that TIBCO consented to nThrive taking over the MedAssets Order Form when it entered into the nThrive Order Form.[65] According to nThrive, TIBCO was aware that an unauthorized third party was using its software licenses

---

[61] Compl. Ex. A § 7.1.
[62] Compl. Ex. A § 21.5.
[63] Oral Arg. Tr. at 27:4–9, 29:3–10; Wolcott Transmittal Aff. in Supp. of Pl.'s Suppl. Br. Ex. D.
[64] Oral Arg. Tr. at 35:3–5.
[65] Oral Arg. Tr. at 3:1–10.

and the nThrive Order Form was entered into in order to resolve that issue.[66] On the other hand, TIBCO asserts that the purpose of the nThrive Order Form was to "memorialize" the business relationship between nThrive and TIBCO.[67]

nThrive, however, fails to address how TIBCO's consent through the nThrive Order Form, entered into on November 10, 2016, would apply retroactively to nThrive's purported termination of the MedAssets Order Form on September 27, 2016. The nThrive Order Form also specifically states that the Maintenance Fees under that contract are "in addition to the existing Maintenance Fees that are due and payable for Software Licensed under previous agreements."[68]

In addition to the contractual ambiguity, a genuine issue of material fact exists regarding the circumstances surrounding the purported termination letter on September 27, 2016 and the parties' actions as it relates to the contractual provisions at issue. The termination letter itself is inconsistent with communications between nThrive/MedAssets and TIBCO representatives during that time, which indicate that MedAssets sought to assign its licenses to nThrive.[69] It also appears from the record that MedAssets knew as early as January 2016 that it would need to amend the MedAssets Order form to reflect that Pamplona was a

---

[66] Oral Arg. Tr. at 22–23:4.
[67] Oral Arg. Tr. at 22:20–23:4.
[68] Compl. Ex. B at 5.
[69] Wolcott Transmittal Aff. in Supp. of Pl.'s Ans. Br. Ex. E.

customer so that it could still access the software.[70]   Just days prior to the termination letter, on September 23, 2016, TIBCO notified nThrive that it was using its software improperly and that the software "has not been contractually assigned following a sequence of extraordinary corporate events involving [MedAssets] that resulted in the renamed entity of nThrive."[71]

It is not clear from the terms of the MedAssets Order Form, nor from the record, how termination is to be treated in the context of the transaction that occurred in this case.  TIBCO's reading of the provisions as prohibiting nThrive from terminating the contract as a non-party not in compliance with the terms is a reasonable interpretation of the Agreement.  When a contract is silent on an issue or there are multiple reasonable, yet conflicting, interpretations of a contract's terms, as is the case here, issues of interpretation cannot be resolved on summary judgment and are left for the finder of fact to determine.[72]

III.   **TIBCO's reading of the contract would not lead to an absurd result.**

nThrive argues that TIBCO's reading of the contract to bind nThrive to MedAssets' responsibilities and obligations under the MedAssets Order Form

---

[70] Aff. of Chad S. C. Stover in Supp. of Def. nThrive Revenue Systems, LLC's Suppl. Br. in Supp. of its Mot. for Summ. J. Ex. 15 at TIB0000069.

[71] Wolcott Transmittal Aff. in Supp. of Pl.'s Suppl. Br. Ex. G.

[72] *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, 2013 WL 1821608, at *12 (Del. Ch. May 1, 2013) (citing *Cooke v. Oolie*, 2000 WL 710199, at *11 (Del. Ch. May 24, 2000)); *Simon-Mills*, 2017 WL 1191061 at *17, *19 (Del. Ch. Mar. 30, 2017).

while simultaneously not providing nThrive with the authority to terminate the contract leads to the "absurd" result of a limbo period where no party could terminate the contract.[73] An "absurd" result from interpreting a contract is "one that no reasonable person would have accepted when entering the contract."[74]

Central to this issue is the timing of nThrive's purported termination of the contract on September 27, 2016 and nThrive's entry into a contract with TIBCO on November 10, 2016, under which nThrive agreed to take over obligations under the MedAssets Order Form. TIBCO's argument is *not* that nThrive was responsible for Silver Level Maintenance under the MedAssets Order Form on September 27, 2016 when nThrive sent the Termination Letter, but rather that nThrive later became responsible for Silver Level Maintenance after entering into the nThrive Order Form.[75] nThrive would have been responsible only for its "unauthorized" use of the license at the time of the Termination Letter, before becoming responsible for continuing to purchase maintenance at the same level as provided under the MedAssets Order Form.[76] MedAssets would have had the ability to terminate the contract and would have been responsible to pay for the

---

[73] Def.'s Suppl. Br., 8; Oral Arg. Tr. at 46:18–47:6.

[74] *Sterling Prop. Holdings Inc. v. New Castle Cty.*, 2013 WL 1821594, at *7 (Del. Ch. Apr. 30, 2013) (quoting *Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)).

[75] Oral Arg. Tr. at 43:1–18.

[76] Oral Arg. Tr. at 29:17–30:5.

license "at that point" because MedAssets was still the contracting party and licensee.[77]

This is not an "absurd" result of TIBCO's interpretation of the terms of the contract, but rather a reasonable one that demonstrates the ambiguity of the contract as to how the relevant provisions interact with each other and how they apply to the present case. As discussed above, issues of interpretation of an ambiguous contract are issues of fact not to be resolved on summary judgment.[78]

## IV.   nThrive's new agency argument cannot be decided on this limited summary judgment record.

Following limited discovery, nThrive included an additional argument based on a theory of agency in its Supplemental Brief in Support of its Motion for Summary Judgment.[79] nThrive asserts that, even if it did not have the authority to terminate the MedAssets Order Form as a party to the contract, it had the authority to do so as an agent of MedAssets.[80]

A principal–agent relationship is created "when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the

---

[77] Oral Arg. Tr. at 30:3–5; 43.

[78] *United Rentals*, 937 A.2d at 830 (Del. Ch. 2007) (citing *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)); *GMG* , 36 A.3d at 783 (citing *Eagle Indus., Inc.*, 702 A.2d at 1232; Solan, *Pernicious Ambiguity*, 79 Chi–Kent L.Rev. at 862 (2004); *United Rentals*, 937 A.2d at 841–42 (Del. Ch. 2007)).

[79] Def.'s Suppl. Br., 8–9.

[80] Def.'s Suppl. Br., 9.

-19-

agent."[81]  Questions of agency "turn on the facts of the individual case"[82] and the party asserting an agency relationship has the burden of proving such a relationship exists.[83]

nThrive generally sets forth three theories of authority under an agency relationship: (1) actual authority; (2) implied authority; and (3) apparent authority.[84]  Actual authority is that which a principal "expressly or implicitly grants to an agent."[85]  Apparent authority is that which, "though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing."[86]  Relevant to the concept of apparent authority is the apparent relationship between a principal and agent, as opposed to an actual relationship.[87]

nThrive asserts that because TIBCO was negotiating with nThrive employees and representatives, and because TIBCO had received the Termination

---

[81] *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57 (Del. 1997) (quoting *Sears Mortgage Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993)).

[82] *Fisher*, 695 A.2d at 61 (Del. 1997) (quoting *Sussex County v. Morris*, 610 A.2d 1354, 1360 (Del. 1992).

[83] *Patel v. Sunvest Realty Corp.*, 2018 WL 4961392, at *4 (citation omitted).

[84] Def.'s Suppl. Br., 10–12.

[85] *Billops v. Magness Constr. Co.*, 391 A.2d 196, 197 (Del. 1978) (citing *Lind v. Schenley Indus., Inc.*, 278 F.2d 79 (3d Cir. 1960)).

[86] *B.A.S.S. Group*, 2009 WL 1743730, at *5 (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10) (Del. Ch. Aug. 26, 2005).

[87] *Billops*, 391 A.2d at 198 (citing *Finnegan v. Robino-Ladd Co.*, 354 A.2d 142 (Del. Super. 1976)).

Letter on nThrive letterhead, TIBCO knew that nThrive had the authority to terminate the contract on behalf of MedAssets.[88] nThrive views the subsequent nThrive Order Form as a confirmation of TIBCO's understanding that nThrive was acting on behalf of MedAssets.[89]

TIBCO's responds that nThrive and MedAssets are two separate entities and that it had to enter into a separate agreement with nThrive because it was an unauthorized user.[90] TIBCO was unaware of how nThrive received those assets, which was why TIBCO sent the September 23, 2016 letter to nThrive.[91]

nThrive's letterhead on the Termination Letter and the negotiations between TIBCO and nThrive representatives leading up to the nThrive Order Form are the only facts asserted by nThrive in its Supplemental Brief to support its argument that it had authority to act on behalf of MedAssets as an agent.[92] nThrive's assertion that it was acting as MedAssets' agent presents an issue of fact that cannot be resolved on this motion for summary judgment.[93]

---

[88] Oral Arg. Tr. at 10:2–8.
[89] Oral Arg. Tr. at 3:1–10.
[90] Oral Arg. Tr. at 22:10–14, 25:1–3, 26:19–23.
[91] Oral Arg. Tr. at 44:13–19.
[92] Def.'s Suppl. Br.
[93] See *Billops*, 391 A.2d 196; *C & C Drywall Contractor, Inc. v. Frank Robino Companies, LLC*, 2013 WL 6113252 (Del. Super. Nov. 15, 2013); *Wise v. Dawson*, 353 A.2d 207, 208–09 (Del. 1975); *Morris v. Blake*, 552 A.2d 844 (Del. 1988) ("Summary judgment will be denied where the agency question is critical to the disposition of the case and where further exploration of the facts is

## CONCLUSION

For the foregoing reasons, nThrive's Motion for Summary Judgment is **DENIED**. It is so ordered.

Meghan A. Adams, Judge

---

appropriate." (citing *Schagrin v. Wilmington Medical Center, Inc.*, 304 A.2d 61 (Del. Super. 1973)); *see B.A.S.S. Group*, 2009 WL 1743730, at *5.